PHILLIP A. TALBERT
United States Attorney
MICHAEL D. ANDERSON
ROSANNE L. RUST
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ARTURO PACHECO, <br><br> Defendant. | CASE NO. 2:20-CR-221 WBS <br><br> **UNITED STATES' NON-OPPOSITION TO DEFENDANT'S FORMAL OBJECTION AND SENTENCING MEMORANDUM** <br><br> DATE: October 17, 2022 <br> TIME: 9:00 a.m. <br> COURT: Hon. William B. Shubb |

## I.  INTRODUCTION

Arturo Pacheco swore an oath to follow the law and act in his role as a corrections officer with integrity.  He was trained to use physical force to protect himself and to ensure the safety of others.  Instead of protecting others, Pacheco used violence because he thought it was "fucken funny," spraying an inmate-victim through a port in a closed cell door with OC spray and pulling the legs out from under another restrained inmate-victim, who consequently bashed his head into a concrete floor.  Rather than act with integrity, Pacheco embraced a "code of silence," getting other corrections officers to lie in official reports to cover up his crimes.  His acts betrayed the oath he took, and he interfered with the lawful and constitutional administration of justice in California.  For his crimes and the harm they caused, a serious sentence of 151 months is warranted.

## II.      RESPONSE TO DEFENDANT'S FORMAL OBJECTION

Consistent with the Plea Agreement, ECF No. 42, the United States does not oppose the defendant's formal objection to final Presentence Investigation Report (PSR) paragraph 40. ECF No. 49. The parties agreed and stipulated to a three-level increase for Victim 1 sustaining bodily injury when the defendant used OC spray on him while Victim 1 was in his cell. If imposed by the Court, this change would not alter the total adjusted offense level, which is 33, or the advisory Guidelines range of 135 to 168 months due to the application of the Chapter 3 rules governing the grouping of multiple counts.

## III.     UNITED STATES' SENTENCING RECOMMENDATION

For the reasons detailed below, the United States recommends the Court sentence the defendant to 151 months imprisonment. As discussed below, a 151-month sentence will achieve the objectives set forth in the sentencing factors listed in 18 U.S.C. § 3553(a).

### A.      The Guidelines support a 151-month sentence.

Under 18 U.S.C. § 3553(a)(4), a significant sentence is warranted. As noted above, the Guidelines range is 135 to 168 months in prison. Imposing a mid-range term of 151 months, as Probation recommends, will properly account for the offense conduct in this case and the other factors the Court must consider.

### B.      To ensure just punishment in this case, to account for the seriousness of the offense, and to promote respect for the law and to provide adequate deterrence, the Court should impose a 151-month sentence in this case.

As noted by the PSR and the facts the defendant admitted to in his Plea Agreement, the offense conduct in this case is serious. The seriousness of the offense, the nature and circumstances of the defendant's repeat and violent conduct, the need to promote respect for the law, and the need to provide specific and general deterrence all support a lengthy 151-month sentence.

In 2016, the defendant was a corrections officer at California State Prison (CSP), Sacramento. In that role, he was responsible for taking care of inmates, many of whom suffered from mental health issues and were, therefore, a part of the Enhanced Outpatient Program (EOP). Those inmates needed a higher level of care. Despite this, on two different occasions, less than four months apart, the defendant hurt two EOP inmates, Victim 1 and Victim 2. Both inmates were restrained when attacked, one in a

cell, the other with his hands cuffed behind his back.  After each incident, the defendant also wrote and submitted false reports to try to avoid punishment.  With respect to Victim 2, the defendant also convinced other officers to write and submit false reports in addition to his own in an attempt to help conceal his unlawful behavior.

More specifically, on May 19, 2016, Victim 1 was captive in his cell, complying with orders, when the defendant chose to spray him with OC spray at close range.  Officers are taught not to use that "brutal" stuff within a six-foot range to avoid long-term injury to the eyes and then, only when an imminent threat exists.  PSR ¶¶ 12, 14.  No such threat existed at the time Victim 1 encountered the defendant, yet the defendant decided to "fuck up" Victim 1 (PSR ¶ 29), by "hos[ing]" Victim 1 with OC spray from only a few feet away.  ECF No. 42 at 15-16.  Then, the defendant lied about it, falsely claiming that Victim 1 said, "I'm going to cut myself and die you fucken cop!"  PSR ¶ 15.  In addition to his false report, the defendant also covered his tracks further by writing Victim 1 up for a violation.  Victim 1 was then rehoused temporarily in the Administrative Segregation Unit.  PSR ¶ 10.

Less than four months later, on September 15, 2016, the defendant harmed another defenseless inmate.  This time it was harder to cover up his actions, however, as there were several other guards around at the time the defendant hurt Victim 2.  The defendant had been asked to conduct a cell move for Victim 2 with his partner and co-defendant Ashley Aurich.  Before starting the escort, the defendant put Victim 2 in handcuffs with his hands behind his back.  Then, the defendant and two other officers began walking Victim 2 over to his new housing unit.  Once inside the rotunda area of the new unit, Victim 2 stopped walking and stiffened his torso.  He thought he was going to be "locked up" rather than moved, so when he got inside the new area he stopped for a moment.  PSR ¶ 18.  Rather than talk to him, the defendant chose violence.  Specifically, the defendant bent down, wrapped his arms around Victim 2's legs and swept them out from underneath him.  PSR ¶ 19.  This caused Victim 2 to fall violently to the floor, striking his head and shoulder on the concrete beneath him.  PSR ¶ 19.  Because Victim 2's hands were handcuffed behind his back, he had no way to catch himself.  Victim 2 broke his jaw and teeth; he injured his right shoulder, and he had a through and through laceration on his chin.  ECF No. 42 at 14, lines 23-28.  Victim 2's injuries were so severe, he needed to be transferred to the hospital right after the incident.  He remained there receiving treatment for the injuries the defendant

3

caused until he died two days later.  PSR ¶ 21.

As soon as Victim 2 left in the ambulance, the defendant began his campaign to cover up his actions.  He falsely told the third officer on the escort that he did not have to write a report as he did not participate in anything requiring him to do so.  PSR ¶ 24.  Notably, the third officer only went on the escort as an "extra hand" because he knew the defendant had other incidents of use of force and he thought it would be safer if he was there to try and stop the defendant from using excessive force.  PSR ¶ 23.  The third officer also wrote a report of the incident accurately describing the defendant's use of excessive force, but consistent with the defendant's direction, he did not submit it to their supervisor.  PSR ¶¶ 24, 27.  The defendant also convinced his partner, a more junior officer, Ashley Aurich, to lie in her report to make it look like the defendant's actions were justified.  PSR ¶ 26.  The defendant further helped convince another officer to alter his report even though he admitted that he "dumped" Victim 2 simply because Victim 2 "pissed [the defendant] off," not because it was justified.  PSR ¶ 25.

Given such conduct, a significant sentence of 151 months is needed.  It will provide just punishment for the defendant's unprovoked, cruel attacks of two separate inmates, who were entrusted to his care and it will sufficiently punish him for the cover up he orchestrated after the fact to try and conceal his illegal conduct.

Additionally, this case illustrates the essential need to deter others from similar criminal conduct.  The defendant relied on a "code of silence" with his fellow officers to commit his crimes and he clearly expected to get away with it.  The officers working with the defendant at CSP Sacramento covered up for one another rather than reporting misconduct.  In the prison environment, where the guards have so much power over the lives of inmates, it is essential that truthful and accurate reports are filed to ensure that the law is being followed.  A 151-month sentence is necessary to deter others who might commit similar crimes and who would embrace a code of silence over the laws they were sworn to uphold.

Finally, a 151-month sentence will further help promote respect for the law, not only in the defendant, but also in others as well.  That sentence will achieve that result by demonstrating to other corrections officers considering violating an inmate's constitutional rights that they will be held accountable for their crimes if they violate the law.  It also affirms the principle that no one, not even those with a uniform, are above the law in this country or in United States District Court.

**C.     Because the defendant should never work in law enforcement again, the need to protect the public from further crimes by the defendant 3553(a) factor is neutral.**

Given the defendant's convictions, he should not be able to work in law enforcement again or, hopefully, in a position where he will have control over and access to a vulnerable population. Consequently, this factor should be neutral in the Court's analysis.

**D.     The defendant's history and characteristics further support the imposition of a mid-range Guidelines sentence.**

The history and characteristics of the defendant also favor a mid-range Guidelines sentence of 151 months. That sentence strikes the proper balance given the defendant's volitional acts in this case and his prior, successful military service. Despite his previous military career, the evidence in this case demonstrates the defendant enjoyed his authority over inmates while he was a guard and he thought hurting vulnerable inmates was funny. *See, e.g.*, PSR ¶ 29. In his own words, the defendant knew how to manipulate the system and what he needed to say to try and justify his behavior. While the defendant may try to claim he hurt the two victims in this case because he suffered from PTSD, the facts of this case do not support that conclusion. Not only was the defendant diagnosed with PTSD well after the incidents in question (PSR ¶ 85), but his conduct at the time was calculated.

A review of the defendant's text thread with a friend right after the incident involving Victim 1 shows that the defendant understood how he could abuse inmates and get away with it. In particular, the defendant sent a copy of his draft, false report to his friend. Then, the defendant explained that he had to wait for Victim 1 to leave the day room before the defendant "could[] fuck [Victim 1] up" because in that space, the defendant was "outnumbered 20:1". PSR ¶ 29. Once Victim 1 was in his cell, alone, the defendant knew he could hurt Victim 1 as there was no one there to witness an assault and the defendant could just lie in his report afterward to make his attack look justified. As the defendant commented, he "just wanted to spray [Victim 1]," so he "[f]ucken hosed him," even though Victim 1 was not trying to kill himself (as the defendant claimed in his false report). ECF No. 42 at 16. Hurting Victim 1 was just "fucken funny" to the defendant and he knew he could get away with it because "[i]t's all about how u write ur report, plus your partners have ur back"; "[b]lood, broken glass, n just u n ur partners. . . . Green light!" PSR ¶ 29; ECF No. 42 at 16. These statements demonstrate the defendant was in control, and he chose to hurt a defenseless victim because he could. He did not hurt Victim 1 because he

allegedly suffered from PTSD. Rather, he did so because he thought it was funny.

This was also not the defendant's only assault on a vulnerable inmate and orchestrated cover up after the fact. As described above, the defendant hurt Victim 2 because he "pissed [the defendant] off". Then, the defendant went to great lengths to try and have consistent false, reports drafted and submitted in attempt to make his assault of Victim 2 look justified. As a result of the cover up, other corrections officers lost their jobs and face criminal charges. Such conduct and the lies afterward demonstrate considered thinking.

Given the defendant's history and characteristics, the imposition of a mid-range Guidelines sentence of 151 months is appropriate.

### IV.  RESTITUTION

The United States has contacted the victims in this case or their next of kin and provided them with information regarding restitution. As of the time of this filing, the United States has received no restitution claims and it appears none will be filed. If that changes, the United States will immediately notify the Court. The government does note, however, that next of kin have submitted a victim impact statement for review by the Court. This statement will be provided to the Court and defense counsel at the sentencing hearing as will any others received before that time.

### V.  CONCLUSION

For the foregoing reasons, the Court should sentence the defendant to 151 months in prison.

Respectfully submitted,

DATED: October 10, 2022

PHILLIP A. TALBERT
United States Attorney

*/s/ Rosanne Rust*
MICHAEL D. ANDERSON
ROSANNE L. RUST
Assistant United States Attorneys

For the UNITED STATES OF AMERICA