| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | EASTERN DISTRICT OF CALIFORNIA |
| 3 | UNITED STATES OF AMERICA,      :    Case No. 2:20-cr-00221-WBS-1 |
| 4 |     Plaintiff,                    :    Sacramento, California |
| |                                Monday, October 17, 2022 |
| 5 |         v.                       :    9:22 a.m. |
| 6 | ARTURO PACHECO,                 :    JUDGMENT AND SENTENCING |
| 7 |     Defendant.                    : |
| 8 | : : : : : : : : : : : : : : : : |

```
9                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE WILLIAM B. SHUBB,
10             SENIOR UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the United States        United States Attorney's Office
     of America:                  BY:  MICHAEL D. ANDERSON, AUSA
13                                      ROSANNE L. RUST, AUSA
                                  501 I Street, Suite 10-100
14                                Sacramento, CA  95814

15   For the Defendant:           DAVID D. FISCHER, ESQ.
                                  5701 Lonetree Blvd., Suite 312
16                                Rocklin, CA  95765

17

     Court Recorder:              RACHEL ALVAREZ
18

19

     Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
20                                1418 Red Fox Circle
                                  Severance, CO  80550
21                                (757) 422-9089
                                  trussell31@tdsmail.com
22

23   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
24

25
```

1  SACRAMENTO, CALIFORNIA, MONDAY, OCTOBER 17, 2022, 9:22 A.M.

2          THE COURTROOM DEPUTY:  Item 5, Criminal 20-221, the

3  United States versus Arturo Pacheco.

4          Counsel, your appearances?

5          MR. ANDERSON:  Good morning, your Honor.  Michael

6  Anderson and Rosanne Rust on behalf of the United States.

7          MR. FISCHER:  Good morning, your Honor.  David Fischer

8  on behalf of Mr. Pacheco, who's present out of custody.

9          THE COURT:  Good morning.

10         The Court has received the final pre-sentence report

11  in this matter, which was made available on September the 12th,

12  and revised as of September the 26th of this year.

13         Mr. Fischer, have you received a copy of that report?

14         MR. FISCHER:  Yes, your Honor.

15         THE COURT:  And have you discussed it fully with

16  Mr. Pacheco?

17         MR. FISCHER:  I have, your Honor.

18         THE COURT:  Mr. Pacheco, have you received a copy of

19  the final pre-sentence report?

20         THE DEFENDANT:  Yes, your Honor.

21         THE COURT:  And have you discussed it with your

22  attorney?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  Who's speaking on behalf of the Government

25  here?

1          MR. ANDERSON:  I am, your Honor.

2          THE COURT:  Mr. Anderson, has the Government received

3   a copy of the report?

4          MR. ANDERSON:  Yes, your Honor.

5          THE COURT:  The Court has received the, the sentencing

6   memorandum submitted by Mr. Fischer as well as several letters

7   which have been provided to the Court.  The Court has also

8   received Mr. Fischer's formal objections to the pre-sentence

9   report, which I would like to take up first.

10          Have you received a copy of those objections,

11   Mr. Anderson?

12          MR. ANDERSON:  Yes, your Honor.

13          THE COURT:  What is your response to his objection to

14   Paragraph 40 of the pre-sentence report?

15          MR. ANDERSON:  Your Honor, consistent with the plea

16   agreement, we have no objection.  I will note, as we noted in

17   our filing, that it does not affect the ultimate offense level

18   of calculation.

19          THE COURT:  There being no objection to the objection,

20   or no opposition to it, the Court will make the requested

21   modification to the pre-sentence report, accordingly.

22   Paragraph 40 of the report is modified to a, an enhancement of

23   3 rather than enhancement of 5 points and the provision is

24   changed from Section 2A2.2(b)(3) to 2A2.2(b)(3)(A).

25          The adjusted offense level in Paragraph 47 is,

1  therefore, now 29 instead of 31 and that change will be made,

2  accordingly.

3          Likewise, on Page 13, Paragraph 57, the adjusted

4  offense level is modified from 31 to 29 on Counts 1 and 3.

5          Otherwise, the calculation of the sentencing

6  guidelines remains unchanged.

7          Are there any other objections to the calculation of

8  the sentencing guidelines, Mr. Fischer?

9          MR. FISCHER:  No, your Honor.

10          THE COURT:  Mr. Anderson?

11          MR. ANDERSON:  No, your Honor.

12          THE COURT:  The Court will, accordingly, adopt the

13  findings of the pre-sentence report as modified and finds that

14  the total offense level is 33 and the criminal history category

15  is 1, correct?

16          MR. ANDERSON:  Yes, your Honor.

17          MR. FISCHER:  Yes, that's right.

18          THE COURT:  All right.

19          I, I've been over the pre-sentence report in detail

20  and there are some issues I'd like each of you to address in

21  your allocution.

22          First, in Paragraph 126 of the pre-sentence report the

23  probation officer suggests that an upward variance may be

24  warranted based upon the fact that the victim RP died and as

25  she points out, that that is not considered in the calculation

1   of the guidelines.  There is a seven-level increase for serious

2   bodily injury, but it doesn't take account of the fact that the

3   injuries resulted in death.

4           So I'd, I'd like you to address that in your

5   allocution.

6           On the other side of the coin, however, in Paragraph

7   127 the probation officer points to Mr. Pacheco's admirable

8   military record and the fact that he has been diagnosed with

9   PTSD, which appears to be a legitimate diagnosis, and the

10  doctor at the VA has related that to unprovoked irritability

11  with periods of violence, suspiciousness, and, among other

12  things, an impaired impulse control.

13          And I'd like you to address that in your allocution

14  because the probation officer suggest that this may warrant a

15  consideration of a downward variance.

16          So with that in mind, I'll hear whatever you have to

17  say, Mr. Anderson.  What would you like to say on behalf of the

18  Government?

19          MR. ANDERSON:  Thank you, your Honor.

20          And your Honor, at some point we'd also ask that the

21  victim RP's family member have an opportunity address the Court

22  under the CVRA.

23          THE COURT:  All right.  We can do that.  I didn't know

24  what you, what you had in mind here.  Because the clerk just

25  handed me a, a one-page document entitled Victim Impact

```
 1   Statement, which I had not received earlier.
 2              Mr. Fischer, have you received a copy of that?
 3              MR. FISCHER:  I have.
 4              THE COURT:  Is it appropriate for the Court to hear
 5   from the victim?
 6              MR. FISCHER:  Well, I, I don't think that there's
 7   anything that allows me to object to it.  The --
 8              THE COURT:  All right.
 9              MR. FISCHER:  -- the Rules allow for a written
10   statement and a verbal statement, or both.  And --
11              THE COURT:  All right.
12              MR. FISCHER:  So I, I don't have a basis to object.
13              THE COURT:  All right.
14              Then would you like me to hear that first before you
15   say what you have to say?
16              MR. ANDERSON:  I would, your Honor.  Thank you.
17              THE COURT:  All right.  I, I don't know that this is
18   signed.  So I just know that it's a relative of the victim who,
19   who, who died.
20              MR. ANDERSON:  Yes, your Honor.  And he's approaching.
21   Ms. Daly is an attorney who's working with the family.
22              THE COURT:  Right.
23              MR. ANDERSON:  And --
24              THE COURT:  I recognize her.
25              MS. DALY:  Thank you your Honor.  Kresta Daly on
```

1  behalf of Mr. Tucker.  Mr. Tucker is RP's family member.

2          THE COURT:  What's your name, sir?

3          MR. TUCKER:  Takis Tucker, sir.

4          THE COURT:  First name?

5          MR. TUCKER:  Takis, Tom, apple, king, igloo Sam.

6          THE COURT:  All right.

7          You may, you may proceed.  What would you like to say?

8          MR. TUCKER:  Basically, I just, want to just read the

9  Victim Impact Statement, give a little rundown after that,

10  nothing, you know, detrimental.  I'm not here to point fingers

11  or, you know, wish bad on anybody, nothing like that.  We all

12  suffer from PTSD, I understand that, and I just want to read

13  the Victim Impact Statement.

14          THE COURT:  Well, I've read it, if, if that'll help

15  you.  I don't, I don't think you have to read it again, but

16  would you like to highlight any portions of it?

17          MR. TUCKER:  I just, I wanted to read it to his family

18  and to him, sir.

19          THE COURT:  Okay.

20          MR. TUCKER:  I don't think he heard it.  I don't think

21  he heard the victim.  Has he heard the Victim Impact Statement?

22          THE COURT:  Well, I'm -- I'm -- he may have read it,

23  but if you want to read it, go ahead.

24          MR. TUCKER:  Yeah.  Because it's just like it was four

25  years.  We didn't know anything about this and then to, it to

1   come to our knowledge about a month-and-a-half ago.

2           THE COURT:  All right.  You may read it.

3           MR. TUCKER:  (Reading):

4           "As you -- you know, to prepare this statement has

5           been tremendously, tremendously difficult and painful.

6           My mom and I have cried before we started to write

7           this.  We had to come to the sense and the reality

8           that Ronnie will not be coming home from prison.  It

9           is difficult because even though Ronnie may have been

10          a felon and was -- and -- and was incarcerated, we

11          never would have, have imagined that a peace officer,

12          who was ordered to monitor and protect, would be the

13          cause of Ronnie's death.

14          From a physical standpoint, we have been drained,

15          okay?  Our momentum with life had just come to a

16          standstill trying to grasp the who and why.  For us

17          just, for us to just find out the circumstances of the

18          crime has made us pretty much weak.  We were thrown

19          off and believed another inmate had done that to

20          Ronnie.  That's what you guys have told us six years

21          ago.  After thinking this was going to be a lifelong

22          mystery and to be made aware that it was, that it was

23          not an inmate is like being stabbed in the back.

24          The lack of energy has developed a stress-related

25          illness since the passing of Ronnie.  My mom" --

1          We got issues with that.  I don't want to get into

2    detail with that.

3          "We have suffered.  It's like an empty space that lays

4          on, on the heart.  It's sad to know that Ronnie is

5          dead.  To first learn about this has given me

6          nightmares knowing my uncle went out in a gruesome

7          way.  When I wake in the morning I think about not

8          ever wanting to go to prison and I always think about

9          self-control.  I feel incredibly sad and cringe when I

10          think about how he was flipped up while he was

11          handcuffed behind his back.

12          I was more like a son to Ronnie.  So it always brings

13          me to tears knowing I won't be able to see or talk to

14          him again.  I've been diagnosed with stress and pain

15          and things like that.  Parts of my body have been

16          hurting, prescribed medication for those things.

17          My mom, she says that she feels tired when she awakes

18          up every morning since the news.  She cries when she

19          thinks about what happened to Ronnie and when she and

20          Ronnie were kids.  She stated that she thinks about

21          all kinds of stuff from childhood days to the

22          nightmare of how he died.  It has been exceedingly

23          difficult for her to sleep.  She tends to stay up

24          later -- not going -- to try -- to try not to go to

25          sleep so sad.  She admits that she has been more tired

1        since learning what really happened.  My mom had

2        already been diagnosed with anxiety and depression

3        from a peace officer injuring my younger brother on a

4        lifelong basis.  My brother hasn't walked or talked in

5        the last nine years, Los Angeles Police Department.

6        Now we've got a correction officer will do that to my

7        mom's brother.

8        So it is, it just adds another type of stress and

9        depression to have my mom to consume more medications

10       to deal with this reality.

11       Our relationship with people has gotten to a bare

12       minimum.  To explain what happened is too painful and

13       it allows the sadness and the spirit to overtake us.

14       My view of the world as a safe and a fair place is a

15       joke.  It made me feel like being black and a man and

16       if a person of authority is not having a good day or

17       has some outside problems, they can easily take it out

18       on you and ruin everyone's life at a drop of a dime.

19       This has been an added negative effect that my mom had

20       to experience and suffer again by the hands of a peace

21       officer.  My mom has suffered from a mental breakdown

22       which caused for her to be hospitalized and prescribed

23       medications for her suffering.

24       One thing, Ronnie may have had some encounters with

25       the law, but, as we know him, he did not care about

1    anything but the well-being of his sister.  He put his

2    family first.  Ronnie had a calm demeanor and it would

3    take an awful lot to get him beside his stuff. Ronnie

4    was funny.  He had a sense of humor and he loved hard

5    candies.  I remember a time after his release he would

6    get with the family and he wanted to listen to his

7    favorite rapper" -- excuse me -- "his favorite singer,

8    Shayday" (phonetic)  "Ronnie has always been there,

9    positively persuading me on staying out of trouble and

10   importance of higher education.  He has always had an

11   influence on my, on me to stay focused and remembering

12   that education was the key to success.  Therefore, I

13   made sure that I graduated with a master's degree in

14   public administration from Cal State University,

15   Northridge.  Ronnie was empathetic towards us when he

16   made mistakes and past mistakes and he had to be

17   incarcerated.  His main concern was for me to make

18   sure that I take care of his sister.  Ronnie was a man

19   of self-respect.  Ronnie had self-control.  He had

20   respect for others and being humble were just some of

21   his characteristic traits.  He respected himself and

22   others.  Ronnie had respect for elders."

23       I understand what you was going through and feeling

24   like that, but I had to learn that you were 32 years old and

25   you did that to a 65-year-old man.  So that's why I put that in

1 | there about the elders.  I know that he had respect for elders.

2 |       "He -- I have never heard him yell or curse loudly and

3 |       abruptly.  He never blew up and went off the deep end.

4 |       He was big on self-control.  I will never forget the

5 |       time when Ronnie told me that a man who holds back

6 |       power, who holds power, he knows how to not get angry

7 |       in as mad a situation.  He was big on demonstrating

8 |       and expressing humbleness and how to not let people

9 |       get under your skin with words.  Ronnie was a health

10 |       nut.  He ate clean and taught me how to take all type

11 |       of vitamins by the mouthful.  He was determined to

12 |       manage his business and get things done whether he was

13 |       in jail or not.  Ronnie was relaxed and a good person

14 |       and he loved his family.

15 |       My mom and I, the rest of the family, we're going to

16 |       miss Ronnie."

17 |       Real quick, just to piggyback on something.  When we

18 | first -- my mom -- well, I bought her a house and I remodeled

19 | the house and she was having an issue with me about her mail.

20 | So we came to an agreement that I would give her her mail with

21 | no problem because that's her personal mail --

22 |     (Cellphone playing music)

23 |       MR. TUCKER:  -- and at that time, two days later this

24 | mail comes.  I take my part out, my mom's part, and I give it

25 | to her.  I go back to working in the yard.  She comes to the

1   door -- I'll never forget that look with the paintbrush -- and

2   she said --

3       (Person talking on cellphone)

4           MR. TUCKER:  Mom.  You got to turn that off, Mom.

5   Just turn that phone off.  You can't have that on like that.

6           Sorry for the interruption.

7           So I gave her the mail and she looked at it.  She came

8   to the door and she told me that, "I knew they had did

9   something to my brother."

10          So I get the letter from the attorneys and the first

11  thing that came to my mind was the time when I was in Juvenile

12  Camp.  I was in Juvenile Camp and they let me become the Group

13  Leader and once I became the Group Leader it was this one

14  person in, in the group, he was a jealous person.  He was

15  jealous of me because of the situation that I was in.  He

16  became jealous.  And I'll never forget.  We had showers and we

17  all went in there and took showers and the guy who was on the

18  opposite side by the wall and he was, he tried to provoke me.

19  He was mad and he tried to provoke me.  He was saying, "Here's

20  the thing."  He dissing me and saying all kind of little weird

21  stuff to try -- I wanted to drop everything and rush that guy

22  so bad.

23          So I didn't think about nothing else, but this what

24  came to my mind immediately and I thought, "So you mean to tell

25  me if I would have rushed that guy in that shower and slipped

1    and fell, I could have broke my jaw, had my teeth come out of

2    my mouth and possibly died two years or two days later."  I

3    said, "Thank you, Lord, for self-control.  Thank you, Lord, for

4    not putting me in that position at 15 years old, letting me

5    think about how to not get in a position that will be

6    detrimental to me and my family."  I was so thankful for that

7    and then I had to face the reality of this.  Okay.

8            So sir, with all due respect to, to, to you, just like

9    I said in the beginning.  I'm not here to damn you, damn your

10   family, wish evil.  We don't, we don't play those games.  My

11   mom did not raise me on hate words.  I promise you, sir.  I

12   know that you did not expect for this to happen.  You didn't

13   expect this outcome.  It was a, you know, fluke, trying, you

14   know.  I know how it go, you know?  We forgive you.  We're not

15   mad.  We forgive you for this, okay?  But as a, not being too

16   much older than you, with all due respect, all I want you to do

17   is just go and find out and make amends with the Lord on your

18   next journey.  Make amends with the Lord.  Help those other

19   inmates out to know about, you know, understand faith and that

20   God can help you out this situation.  You going to be all

21   right, okay?

22           THE COURT:  All right.  You -- you -- you --

23           MR. TUCKER:  And we're going to go from there and

24   that's it.

25           THE COURT:  -- need to address the Court, not --

```
 1  not -- not --
 2              MR. TUCKER:  Oh.  Well, I'm just letting him know,
 3  sir, 'cause he's getting ready to go to prison.  So you know --
 4              THE COURT:  I know.
 5              MR. TUCKER:  -- I understand that.
 6              THE COURT:  But you -- you -- it's --
 7              MR. TUCKER:  I'm talking to you, too, sir.
 8              THE COURT:  All right.
 9              MR. TUCKER:  I'm talking to the whole Court.  You
10  know, I respect -- and thank you, guys, for even notifying us
11  and letting us know because you didn't even have to let us
12  know.  So we respect everything.
13              THE COURT:  All right.
14              MR. TUCKER:  All right.
15              THE COURT:  Thank you.  It's, it's important --
16              MR. TUCKER:  Yeah.  It was --
17              THE COURT:  It's important not to lose sight of the
18  victims.
19              MR. TUCKER:  Oh, absolutely.  Yeah.  Thank you.
20              THE COURT:  All right.
21              MR. TUCKER:  All right.  Have a good day.
22              THE COURT:  All right.  Mr. Anderson, what would you
23  like to say on behalf of the Government?
24              MR. ANDERSON:  Thank you, your Honor.
25              Your Honor, as the Court knows, this is a very serious
```

1  crime that was committed by somebody who was in a position of

2  trust and to run a justice system people like the defendant

3  need to be able to be trusted, to be truthful, and follow the

4  law.

5          The Court has asked two questions about two of the

6  paragraphs in the PSR.  Those, those paragraphs have to do

7  with, first, the seriousness of the assault, and I think part

8  of what the Court should consider is the end results of what

9  happened.  A man died who shouldn't have died, who shouldn't

10  have been in that position, but the murder guidelines don't

11  apply here for a reason and that's because of the attenuation

12  that we see in Paragraph 22 of the PSR and it, it deals with

13  sort of the gap in time and this intervening event of a blood

14  clot that ultimately caused Mr. Price's death.

15          So this is an extremely serious assault and I think

16  while we could say in some sense but for that assault, it

17  appears unlikely that Mr. Price would have died or certainly

18  died then.  This is not the proximate cause situation where

19  this assault caused that death immediately or where this is a

20  murder that was premeditated by Mr. Pacheco.

21          THE COURT:  That's a cogent comment because I noted

22  that the doctor who did the autopsy used the word "homicide."

23          MR. ANDERSON:  So the, the doctor who did the autopsy,

24  I don't believe used the word "homicide," but the coroner who

25  then reviewed that autopsy report, as the Court said, said

1  "homicide."  The FBI looked into that and asked follow-up

2  questions about that homicide and those, sort of a summary of

3  that is contained in Paragraph 22 of the PSR, the end result of

4  it being that there's that separation in time and causation

5  which is why we thought very carefully about it, but treated

6  this as a very, very serious assault, which it was, which did

7  have the consequence of death, but was not --

8           THE COURT:  What, what would it have taken for the

9  guidelines to have been enhanced if there was a, a finding of

10  proximate cause?  Would that -- would, would you have to go to

11  the murder guidelines or would you only go to homicide?

12           MR. ANDERSON:  Right.  So, so the question would be do

13  we have a first-degree murder or a second-degree murder?  Is it

14  a depraved-heart murder where there was extreme recklessness,

15  which --

16           THE COURT:  Or was it just not a crime?  You see, if

17  it's a proximate cause, it doesn't have to be a crime.  You're

18  saying that you didn't or you weren't satisfied that there was

19  a chain of causation.

20           MR. ANDERSON:  We were -- we're saying that we were

21  not satisfied that we could sustain a conviction or the

22  guidelines in front of this Court on a murder charge.

23           THE COURT:  Okay.  I, I'm not talking about murder.

24           MR. ANDERSON:  Uh-huh (indicating an affirmative

25  response).

1          THE COURT:  I'm talking about if you were satisfied

2     that Mr. Pacheco's actions proximately caused the death of the

3     victim, would the guidelines be different or would you be

4     asking for a different sentence?

5          MR. ANDERSON:  I, I see what you're saying.

6          I think we would be asking for a different sentence.

7     We'd be asking for a higher sentence whether --

8          THE COURT:  Or would the guidelines be different?

9          MR. ANDERSON:  I don't think so, your Honor.  I think

10    the guidelines would be the same, but the way you would get

11    there is through either an upward departure or an upward

12    variance.

13         That said, I, I don't think we can ignore how serious

14    this assault was or that it put Mr. Price in that position.

15    And so that's a factor that I think pushes toward a higher

16    sentence and balances against some of the things that the Court

17    also mentioned with regard to, to the defendant's PTSD.

18         And the PTSD is interesting, too, because there's no

19    chain of causation there, either.  So they've been unable to

20    identify a doctor or an expert who says that this incident or

21    the prior incident was caused by PTSD.  And one thing they

22    absolutely cannot show is that the lies that he told afterward

23    were in any way related to the mental condition.

24         So I, I think one of the really essential things to

25    remember in this offense is he didn't just react one time, but

1  there were, there was more than one event where he acted out

2  violently against a person who was restrained who could not

3  fight back and then in each of those instances he told fairly

4  elaborate lies to cover up what he had done, the first instance

5  doing it by himself, but in the second instance with Mr. Price,

6  getting a large number of CDC officers and guards to

7  participate in this coverup.

8       So he relied on this and encouraged others to lie and

9  using this code of silence to protect himself and protect

10 himself from justice, the idea being what happens behind these

11 prison walls Mr. Pacheco can lie about, he can do whatever he

12 wants, and he'll be supported by these other officers and the

13 Government, the FBI, CDCR, the Court will never know about it.

14 And, and he relied on that in a way that I think is really,

15 really important to remember as the Court is considering the

16 sentence to impose.  It justifies a very big sentence not just

17 because the seriousness of the crime and the damage it does to

18 the justice, pursuit of justice, but also because it, it

19 reflects on the importance of deterrence in this type of

20 situation.  It's very, very important that it be understood

21 that that code of silence doesn't work, that there are serious

22 penalties on the other side of this, and that ultimately, it's

23 judges not jailers that are going to impose sentences in

24 prison.

25       This is a man who essentially decided that he was

1  going to sentence two men to be assaulted and hurt very

2  seriously because of his own views on their worth and what they

3  deserved, but that's, that's so contrary to how our system

4  works, right?  We're a system where we have laws.  You come

5  into court, a sentence is imposed.  That sentence needs to be

6  within the Constitution, not something that is done in the

7  instance by a CDCR officer who thinks he can get away with it

8  and cover it up.  It's a position that no law enforcement

9  officer should ever put themselves in.

10             THE COURT:  For purposes of deterrence, how, how much

11  difference do you think it makes between a sentence of 151

12  months which you're asking for and 121 months which Mr. Fischer

13  is asking for?

14             MR. ANDERSON:  I think it makes a difference, I think

15  it makes a substantial difference because 151 months is in that

16  guidelines range, in the middle of the guidelines range, and

17  reflects the application of all the enhancements that

18  rightfully apply in this case, that someone was restrained,

19  that they were vulnerable, the position of trust that the

20  defendant was in, and it says each of these things are

21  important and each of these things leads to a bigger sentence.

22             THE COURT:  But others, others who might contemplate

23  the same type of conduct wouldn't be that sophisticated.

24  They'd see that it's a sentence greater than ten years.

25             MR. ANDERSON:  I, I think in a way that's an argument

1  you could make with any of the sentences that the Court

2  imposes.  We always have to pick a number and could it be one

3  month lower or one month higher, but in this case when you

4  apply the 3553 factors, including those guidelines, it's

5  suggesting that a really substantial sentence is warranted and

6  that 151 months is a substantial sentence, 12-1/2 years, which,

7  which indicates how seriously, how seriously the guidelines and

8  the sentencing factors take this crime.  It -- it -- even

9  leaving aside the ultimate death of Mr. Price, this is an

10 assault that left his face, broken jaw, bloody, blood coming

11 out of his ear.  I mean, it was a very, very serious assault

12 that was unprovoked to a man who had his hands restrained

13 behind his back who was 65 years old attempting to just, as, as

14 his family member said, you know, avoid violence, get, get his

15 way out of prison, and instead, he ended up in the hospital and

16 then, of course, ultimately died.

17      And, and we see a really similar thing with the

18 earlier incident, too.  So we, we have an inmate who's in a

19 prison cell behind a door and he's ordered to come closer to

20 the door so that Mr. Pacheco can spray him through the door in

21 the eyes.  He's ordered to open his eyes.  He complies.  He

22 opens his eyes and looks at Mr. Pacheco so that he can be

23 assaulted with spray that even under CDCR guidance should not

24 be used at that distance unless it's absolutely necessary.

25      THE COURT:  Do you think that as a former correctional

1  officer Mr. Pacheco would be himself subject to greater risk of

2  violence in prison?

3           MR. ANDERSON:  Our plan today, your Honor, is to ask

4  the Court, or to agree to recommend a self-surrender date so

5  that Mr. Pacheco can be designated to a prison and self-

6  surrender at a, at a particular facility once he's been

7  designated.  BOP will have all of the information necessary to

8  understand what it will take to keep him safe and he will,

9  unfortunately, not be the only correctional officer, prison

10 guard, police officer, who is in federal custody.  There are,

11 unfortunately, many civil rights violations like this one

12 across the country and he will not be the only inmate kept in

13 that way.

14          So, so there are ways to do that.  We're not asking

15 for him to go into the Sacramento County Jail today.

16          THE COURT:  Anything else you wanted to say?

17          MR. ANDERSON:  Your Honor, ultimately, this is a, this

18 is a crime that erodes the community's trust in the justice

19 system, the trust that people have in those that wear a badge,

20 that work in law enforcement.  It's a crime that Mr. Pacheco

21 knew through training, through experience that he should not

22 commit, and ultimately, he violated his oath and lied and I

23 think that the Court should impose a 151-month sentence to

24 reflect the seriousness of that crime and we ask the Court to

25 do so.

1          Thank you.

2          THE COURT:  Mr. Fischer, what would you like to say?

3          MR. FISCHER:  Your Honor, I, I would like to just

4    start by saying that the sentence that we're asking the Court

5    to impose is 121 months.  It's more than ten years and by no --

6    and, and Mr. Pacheco acknowledges that what he did was wrong.

7    He is extremely remorseful for what he did and I think that's

8    a, the first thing that he would like you to know, that he

9    understands, and I think that's how I want to start this

10   presentation.

11          With regard to the Court's specific questions about

12   upward variance due to the, the fact that Mr. Price ultimately

13   died, I think the one part of the conversation that got left

14   out between you and the Government was the fact that this

15   pulmonary embolism was undiagnosed and it was undiagnosed at UC

16   Davis Medical Center and I think had there, in looking at

17   literature from the Mayo Clinic, if somebody is actually

18   diagnosed with the condition, they have a very good chance of

19   not dying as a result.  In this particular case, the discovery

20   and the reports that I have are that he was on the floor and

21   then they put Mr. Price in the bed and put him on a breathing

22   mask and things like that.  I -- it seemed to me and my memory

23   in reviewing discovery that nobody knows about this pulmonary

24   embolism part until the autopsy.

25          So there's no doubt that he had difficulty breathing,

1   that they put a mask on him, and things like that.  But

2   ultimately, I think had his pulmonary embolism been diagnosed

3   there would be a significant chance that he would not have

4   died.

5          THE COURT:  No, but we all know from basic tort law

6   that intervening negligence in medical treatment is not the

7   break in proximate cause, yet, yet the Government seems to

8   concede that they can't prove proximate cause.

9          MR. FISCHER:  Right.  I think that's just in addition

10  to -- I, I think that there, the conversation you had is

11  correct.  There is this causation issue and whether this, this

12  pulmonary embolism, whether he's the proximate cause of that,

13  and I think a, a step in addition to that is the fact that it

14  wasn't diagnosed.

15          So that's what I have to say about that.

16          And with regard to, the second question the Court

17  asked about the PTSD, I think what, the frustration that

18  impacts the impaired impulse control is something that needs to

19  be considered.  You know, again, Mr., Mr. Pacheco acknowledges

20  that what he did was wrong.  He's extremely remorseful.

21  Nothing that either of these people did, they did not deserve

22  any, to be injured by Mr. Pacheco for anything that they did.

23  But just the, the things leading up that have to do with

24  impulse, impaired impulse control and the PTSD, I think go into

25  frustration.  Like with the, with the, the first victim with

1   the pepper spray incident, there's the situation where, you

2   know, he's creating this massive disturbance that could lead to

3   a riot or something very serious in the yard.  They put him

4   into a cell for his own protection and then the guy breaks out

5   the window and causes another problem.  I think it's that

6   frustration that gets billed from somebody who is just not

7   complying, who's being a problem that kind of -- you know,

8   Mr. Pacheco's response to that shouldn't have been to pepper

9   spray him and he knows that and it was wrong to do so, but as

10  the probation report --

11          THE COURT:  I, I can understand that, I can understand

12  that argument and, and it might be better for you if you had a

13  doctor that would actually say that.

14          But the Government makes it, the point that it's not

15  just the conduct.  It's the covering up and there isn't even a

16  suggestion that the PTSD has any relationship to that, is

17  there?

18          MR. FISCHER:  I, I think it's just part and parcel of

19  the whole, the, committing the crime, the response to it.  It's

20  all part and parcel.

21          THE COURT:  It's --

22          MR. FISCHER:  I think the, the response and everything

23  else is -- is -- and it's not a defense to the crime.  It's

24  just something --

25          THE COURT:  It's a whole different culture, though.

1   It's a whole different -- I don't see any, even suggestion

2   that, that that could somehow be influenced by PTSD.

3          MR. FISCHER:  Well, the, the actual, the assault

4   itself, I think those arguments go to the assault themselves

5   as --

6          THE COURT:  Right.  Right.

7          MR. FISCHER:  -- opposed to the covering part.

8          THE COURT:  But that's what I'm asking you to address.

9   The Government's argument that it, it's not just the assaults.

10  It's the covering up, the whole culture that he created at the

11  institution that is, is toxic.

12         MR. FISCHER:  That's, that's wrongful and he

13  acknowledges that.  And absolutely, a sentence of 121 months

14  would reflect the seriousness of that.

15         So I, I guess those, those are the comments I have.  I

16  think with the frustration and PTSD and, and a lack of impulse

17  control goes to the assault part, not specifically to, to

18  covering it up.

19         Again, I, I, I put the arguments in the sentencing

20  memorandum as to why we, we feel that a sentence of 121 months

21  is, is appropriate.  It's a very severe sentence for somebody

22  who has served our country, who has acted very well, who has

23  had a lack of criminal record before this or since this, and

24  somebody who's never going to be in a position where this type

25  of situation is going to happen again.

1          So for all those reasons, we'd ask the Court to impose

2  121 months.

3          THE COURT:  Mr. Pacheco, what would you like to say on

4  your own behalf?

5          THE DEFENDANT:  I'm extremely remorseful, your Honor.

6  I apologize.

7          THE COURT:  This is a very difficult decision for the

8  Court.  I'm looking at the probation officer's report, again,

9  in which she sets forth the justification for her

10  recommendation and there is so much there to consider.

11          Needless to say, the, the Court has considered the

12  sentencing guidelines and all of the other relevant factors in

13  Section 3553(a) of Title 18, United States Code.  On the one

14  hand, the statement of the victim's nephew is very persuasive.

15  The Court can neither lose sight of the fact that there are

16  victims to these crimes and sometimes we do.  Sometimes we only

17  see the defendant here and we don't remember that it was

18  someone whose life was changed or ruined as a result of the

19  conduct of the defendant.

20          One thing that I would add is that when judges

21  sentence someone to prison, we need to know that they're going

22  to be safe.  We couldn't do our job if we thought that the

23  people that we sent to prison would be assaulted or killed or

24  otherwise mistreated as a result of their being in prison.

25          So as the Government points out, the whole system

1   depends upon our being assured that when we send someone to

2   prison this kind of thing isn't going to happen.

3          On the other side, we know that PTSD is real.  It's,

4   it's, it's not something that we can just look at in a book and

5   there's a lot we don't know about it.  We also need to know

6   that when we send a soldier to battle, that he's going to be

7   safe and this wasn't diagnosed until it was too late and I

8   think there's a real likelihood that this would not have

9   occurred but for the PS, PTSD that Mr. Pacheco suffered as a

10  result of serving his country.

11         Neither of these considerations is taken into account

12  in the guidelines and the, the question is does anything that I

13  have heard justify a variance from the guidelines and, and I

14  would say that they might except that each one of these factors

15  that I have made reference to suggests a variance in, in the

16  opposite direction and I'm left with the conclusion that the

17  best sentence, the one that is sufficient but not greater than

18  necessary to accomplish all of the relevant purposes, both of

19  the sentencing guidelines and otherwise, is a sentence within

20  the guideline range.  Do I sentence to the 151 months

21  recommended by the Government and the probation officer or do I

22  sentence somewhere else within the guidelines?  Again,

23  there -- there's -- there's very little to suggest to me that a

24  sentence in the middle of the guidelines, which has been

25  proposed by the probation officer, is, is not the best sentence

1    under the circumstances.  It is, admittedly, a, a harsh

2    sentence and it sends out a very strong message and I don't

3    think that that's a stronger message than needs to be sent.

4            If it were not for the coverup, we could, I could

5    probably conclude that a lesser sentence within the guidelines

6    was appropriate, but with everything that Mr. Pacheco did to

7    cover up his actions and as a result -- it hasn't even been

8    discussed yet -- damaged his, his fellow officers.  Some have

9    been disciplined.  Others have been compromised.  All of that

10   is something that's also not taken into account.  And so I

11   think that the, the sentence recommended by the probation

12   officer is the appropriate sentence in the, in this case.

13           So pursuant to the Sentencing Reform Act of 1984 it is

14   the judgment of the Court that the defendant is hereby

15   committed to the custody of the Bureau of Prisons to be

16   imprisoned for a term of 120 months on each of Counts 1 and 2

17   and a term of 151 months on Counts 3 and 4, all to be served

18   concurrently, for a total term of imprisonment of 151 months.

19   The defendant shall pay a special penalty assessment of $400,

20   payment to begin immediately.  The Court finds that the

21   defendant does not have the ability to pay a fine and,

22   therefore, the imposition of a fine is waived.

23           Upon release from imprisonment, the defendant shall be

24   placed on supervised release for a term of 36 months on each of

25   Counts 1, 2, 3, and 4, all to be served concurrently, for a

1   total term of 36 months.

2           Within 72 hours of release from the custody of the

3   Bureau of Prisons, the defendant shall report in person to the

4   Probation Office in the District to which he is released.

5           While on supervised release, the defendant shall not

6   commit another federal, state, or local crime and shall not

7   illegally possess controlled substances.

8           He shall cooperate in the collection of DNA as

9   directed by the probation officer and shall comply with the

10  standard conditions which have been recommended by the United

11  States Sentencing Commission and adopted by this Court.

12          Further, he shall refrain from any unlawful use of a

13  controlled substance and he shall submit to one drug test

14  within 15 days of release from imprisonment and at least two

15  periodic drug tests thereafter not to exceed four drug tests

16  per month.

17          Mr. Fischer, have you gone over the special conditions

18  listed on Pages 3 and 4 of the pre-sentence report with

19  Mr. Pacheco?

20          MR. FISCHER:  Yes, your Honor.

21          THE COURT:  Mr. Pacheco, have you read and do you

22  understand those special conditions?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Very well.

25          The Court adopts those special conditions listed on

1   Page 3 and 4 of the pre-sentence report as conditions of

2   supervised release.

3           What institution do you recommend or do you suggest

4   that the Court recommend, Mr. Anderson?

5           MR. ANDERSON:  Your Honor, generally, defense makes a

6   specific recommendation.  For the Government's part, just a

7   recommendation that a facility be selected consistent with

8   Mr. Pacheco's prior employment as a CDCR officer.

9           THE COURT:  Well, I want to make sure they give due

10  consideration to that because that's part of what you've

11  represented to the Court.  You don't know what that would be,

12  however.

13          MR. ANDERSON:  I don't know specifically where BOP

14  will decide to put him, given the other factors that they're

15  going to have to evaluate with regard to a security

16  classification, but I, I believe that this will be a very

17  prominent part of that decision making.

18          THE COURT:  All right.

19          Do you have any specific suggestions, Mr. Fischer?

20          MR. FISCHER:  We would just like to, to be as close to

21  Cal, Northern California as possible in the appropriate

22  institution.

23          THE COURT:  All right.  It might be a good idea here

24  for you to be in touch with the Bureau of Prisons and make sure

25  they give proper rate, weight.  Because you've suggested one

1    thing, that he wants to be close to Northern California.  I

2    don't know if that's best for his own protection or not.

3           So I, I want to make sure that due consideration is

4    given to all of these concerns.

5           MR. FISCHER:  Understood.

6           THE COURT:  The Court will recommend that, that

7    Mr. Pacheco be incarcerated at an institution close to Northern

8    California, but one in which the Bureau of Prisons is satisfied

9    that due consideration is given to his protection and the fact

10   that he has been a correctional officer and all of, all of the

11   other considerations dealing with security classification and

12   space availability.

13          What date would you suggest for surrender?

14          MR. ANDERSON:  Your Honor, I'd suggest something at

15   least six weeks out to make sure that the designation has time

16   to be completed prior to that date.

17          THE COURT:  Mr. Fischer, what would you suggest?

18          MR. FISCHER:  I would suggest January 6th.

19          THE COURT:  That's a Friday.  I don't know if they'd

20   like it on Friday.  I -- I -- I -- I'm, I'm going to go with

21   January the 10th, is that all right?

22          MR. FISCHER:  Yes.

23          THE COURT:  All right.

24          Mr. Pacheco, you're ordered to turn yourself in at the

25   institution selected by the Bureau of Prisons by 2:00 p.m. on

1  January the 10th.

2          THE DEFENDANT:  Thank you.  Thank you, your Honor.

3          THE COURT:  All right.

4          He's waived his right to appeal, correct?

5          MR. ANDERSON:  Yes, your Honor, he has.

6          MR. FISCHER:  Yes, your Honor.

7          THE COURT:  Is there anything else we need to cover at

8  this time?

9          MR. ANDERSON:  No, your Honor.  There are no counts

10  that need to be dismissed.

11          THE COURT:  All right.  Thank you.

12          MR. ANDERSON:  Thank you.

13          THE COURTROOM DEPUTY:  Court's adjourned.

14      (Proceedings concluded at 10:10 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2              I, court approved transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in the above-entitled

5    matter.

6    /s/ *Janice Russell*                    February 21, 2023

7    Janice Russell, Transcriber                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25